

Edwin R. Hutchinson, Calvin H. Milans, Hutchinson & Milans, Washington, D. C., Rufus M. Franklin, Allan R. Redrow, Worcester, Mass., Morton Company, Alvin Guttag, John W. Malley, Cushman, Darby & Cushman, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel) for the Commissioner of Patents.

51 CCPA

**Application of John J. SCOTT (three cases).**

**Patent Appeals Nos. 7079-7081.**

United States Court of Customs and Patent Appeals

Jan. 23, 1964.

Before WORLEY, Chief Judge, and MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

These three appeals are from the decisions of the Board of Appeals refusing claims on three patent applications.

The three applications have a common inventor and relate to a method of synthesizing metal[1] carbides by the reaction of metal oxide ore and coke in an electric arc furnace. The primary difference between the three cases is the metal employed. In No. 7079, the application[2] is concerned with improvements in producing zirconium carbide. In No. 7080, the application[3] relates to a process of making boron carbide. In No. 7081, the application[4] relates to a process of making titanium carbide. Because the melting points of the various metals are different, the rate of addition of the raw materials differs slightly in each case.

---

1. For our purposes here, the element boron will be considered a metal.

2. Serial No. 717,374, filed February 25, 1958.

3. Serial No. 717,452 filed February 25, 1958.

4. Serial No. 717,494 filed February 25, 1958.

The issue is whether the differences between the claimed invention and the invention disclosed in the prior art patent improved upon are such that the invention as a whole would be obvious to one of ordinary skill in the art.

Appellant's process involves a conventional electric arc furnace in which two electrodes are inserted vertically toward the bottom of the furnace. A "bridge" of carbon is placed to conduct the electricity which flows down one electrode, across the bridge, and up the other electrode. A gap is set between each electrode and the carbon bridge across which an arc is struck. The granulated mixture of reactants, metal oxide and coke, is exposed to the electric arc in such a manner as to form solid incandescent ingots of metal carbide at each arc-producing electrode. As the reaction proceeds and more metal carbide is formed, the electrodes are raised so as to maintain an arc between the electrodes and the ingots. The metal carbide conducts electricity, so the current continues to flow as the electrodes are raised. As the raw materials are consumed, more of the mixture is added to keep the ends of the electrodes covered at all times and thereby keep air away from the zone of reaction of the arcs. The rate of addition of the mixture is 0.4 to 0.8 lbs. per kilowatt hour in No. 7079; 0.8 to 1.2 lbs. per KWH in No. 7080, and 0.5 to 0.75 lbs. per KWH in No. 7081.

An illustrative claim is claim 1 of No. 7080 which reads:

"1. The process of synthesizing boron carbide by the reaction of boron oxide ore and coke in an electric arc furnace while maintaining reducing conditions at the zones of reaction, which comprises forming in an electric arc furnace having vertically moveable electrodes a furnace bottom of refractory oxide material, placing a mass of carbon above said bottom at the eventual locus of each electrode, forming a bridge of carbon above said bottom electrically connecting said masses, maintaining said bridge of carbon at all times during the process, placing said electrodes at said loci in electrical contact with said masses of carbon and energizing said electrodes at from 50 to 150 volts, maintaining during the process a mixture of said boron oxide ore and coke around the bottoms of said electrodes and forming thereby as many distinct ingots of boron carbide as there are electrodes one ingot under each electrode, feeding said mixture of boron oxide and coke to around the bottoms of said electrodes at the rate of from 0.8 to 1.2 lbs. of mixture per KWH of electrical energy energizing said electrodes, and maintaining the said ingots clear of each other whereby the path of the electric current after the process has been started is always from one electrode to another electrode, via first an arc, then through a boron carbide ingot synthesized by the process, then through one of said masses of carbon, then through the bridge, then through another of said masses of carbon, then through another boron carbide ingot synthesized by the process, then by an arc to another electrode, and building up the boron carbide ingots synthesized by the process under the electrodes without the formation of any considerable pool of molten boron carbide as the electrodes gradually rise during the process by reason of the energization of the electrodes at 1 KWH for each 0.8 to 1.2 lbs. of mixture fed."

Each of the claims in each of the appeals is rejected as being unpatentable over a single prior art patent:

Ridgway    2,285,837    June 9, 1942

The specification in each of the applications recognizes the Ridgway patent, points out its alleged shortcomings, and purports to define improvements over the Ridgway process.

Ridgway discloses a method of synthesizing carbides of the same metals in an electric arc furnace by reacting metal

oxides with coke. Ridgway was aware of the problem of contaminating the metal carbides with metal oxides and nitrides if air were permitted access to the arc. Therefore, the furnace in Ridgway is deep and narrow to keep out air and adding hydrocarbon oils to the mix is suggested to augment gas evolution as an aid in scavenging the flue-like furnace to keep out air.

The temperatures employed in Ridgway are such that the metal carbide is formed in a molten pool under the two electrodes rather than in solid ingots. While a bridge of carbon is placed under the electrodes at the start of the process to electrically join them, the molten pool that is formed in operation is conductive and obviates the need for a carbon bridge. Presumably, the initial carbon bridge is consumed in forming the carbide or else is dissolved in the molten pool.

There seems to be no dispute as to what the differences are between the present claims and the Ridgway process. They are: (1) appellant maintains a bridge of carbon electrically connecting the two ingots throughout the process; (2) appellant claims a specific rate of feed of the mixture of coke and metal oxide and (3) the claims recite "without the formation of any considerable pool of molten * * * carbide."

The examiner challenged the statement that no pool is formed in appellant's process, and was unconvinced by affidavits which were submitted to show that no substantial pool is formed. The Board of Appeals disagreed with the examiner and conceded that pool formation does not occur in appellant's process. Nevertheless, the board was of the opinion that whether or not a pool is formed depended on the rate at which the raw materials are fed to the furnace and that the claimed feed rate could be used by the operator of the Ridgway process. The board found that the presence of individual ingots and the absence of a pool are "the inherent result of the positive procedural details recited and are not in themselves procedural aspects of the process." Since

Ridgway forms a bridge of carbon in starting the furnace, the board appears to have considered that the bridge would inherently be maintained if a pool were not formed. The sole difference over the Ridgway patent, in the board's view, is in the claimed feed rate of mixture, since the other differences are the result of the proper feed rate. The board said:

"* * * While the feed rate is not given, there is no basis to assume that, in operating within the purview of the Ridgway patent, the production of independent ingots under each electrode formed by sintering rather than melting without the formation of a substantial pool would not inherently be produced by the operator of the Ridgway process. We are accordingly in agreement with the Examiner that the limitations with respect to the formation of distinct ingots without the formation of a pool of the molten carbide, do not constitute features which distinguish over the process of Ridgway, and the rejection will accordingly be sustained."

Appellant contends that Ridgway is limited to a molten product which lies in a pool at the bottom of the furnace, that the carbon bridge is dissolved in the molten pool and that the product is solidified as a single ingot from the molten pool. In contrast, according to appellant, solid ingots are formed under each electrode in appellant's process and the formation of a molten pool must be avoided. The disclosure teaches the maximum and minimum limits for the size of the carbon bridge as a function of electrode diameter and specifies the critical limits of feed rate. Appellant argues that the Ridgway furnace was impractical and the Ridgway process, by the terms of the patent, cannot be carried out in arc furnaces of conventional design.

It is clear from a reading of the Ridgway patent that the process there disclosed produces only a molten pool of metal carbide and not separate solid ingots. Even assuming the board's analy-

sis is correct and that the only procedural distinction is in the feed rate, we are of the opinion that this difference is not obvious to one of ordinary skill in the art. Appellant determined that if the feed rate were maintained within critical limits, solid ingots would result. That the feed rate is critical is evident from the statement, repeated in each of the three applications, that

"Probably the most important single consideration in the operation of the furnace is the control of the process of reaction and incipient fusion that makes it possible to grow ingots without at any time forming a molten pool of product in the bottom of the furnace. This process is controlled by feeding the raw materials to the furnace at a predetermined rate."

Since Ridgway lacked any conception of forming solid ingots, there is nothing to suggest the critical feed rate in the patent. Appellant found that the Ridgway process did not solve the problem of contamination of the metal carbide because the pool caused "reoxidization of the carbide resulting in a low grade product." As stated in each of the three specifications: "By avoiding the formation of any substantial pool of molten carbide, the process herein described is a much more practical arc furnace method of making [metal] carbide and produces a better product." There was no challenge below to this allegation of improved results over the Ridgway process. Whether it be the result of a different feed rate, as suggested by the board, or a different power level, as suggested by the solicitor, there is no question that the results obtained by the instant process are superior to those of the patent. Variations in the feed rate or in the power level of Ridgway could be made within the invention there described, but when an entirely different and improved product is obtained by using different conditions from those disclosed in the patent, it would appear that a new patentable invention has been made.

While the claimed limitation of "maintaining said bridge of carbon at all times during the process" might of necessity occur if the temperature or feed rate were obvious to the operator of the Ridgway furnace, it is still a difference between the subject matter claimed and the prior art and it cannot be ignored. The statute requires these differences to be considered as one skilled in the art would consider them. It does not seem likely that one skilled in the art would consider maintaining a carbon bridge to be obvious in the Ridgway process, because it would be impossible to keep the carbon bridge from dissolving in the molten pool.

It would appear that the only fundamental difference between the Ridgway process and appellant's process is that appellant operates at a lower temperature to obtain a solid metal carbide rather than a liquid. We cannot say that it would be obvious to create this lower temperature by using a different kind of furnace in which electrode diameter and carbon bridge cross-section have a specific relationship and operating under precisely controlled conditions defined in the claims to produce a more satisfactory product than heretofore obtained. To operate the Ridgway process at such a low temperature that the metal carbide remains solid goes directly contrary to the teachings of the patent. Since improved results are obtained by virtue of the differences over the conditions in Ridgway which are defined in the claims on appeal, we cannot agree with the board that the operator of the Ridgway process would inherently produce independent ingots.

For the foregoing reasons, the decisions of the Board of Appeals are reversed.

Reversed.